## THE ILLINOIS CENTRAL RAILROAD CO.
### v.
### EDWARD JONES, Adm'r.

NEGLIGENCE—SAFETY OF MACHINERY.—An employer is not an absolute insurer to the servant that the appliances furnished are safe and sufficient. He is only required to use reasonable diligence in this respect.

2. SERVANT'S KNOWLEDGE OF DANGER.—If a servant knows that what is provided is not safe and fit he should quit the employment, and if he does not, but continues it, he is deemed to have assumed the risk of all such known defects, unless he has been induced by the master to believe that the defect will be remedied.

APPEAL from the Circuit Court of Alexander county; the Hon. DAVID J. BAKER, Judge, presiding. Opinion filed September 29, 1882.

Messrs. GREEN & GILBERT, for appellant; that knowledge of a defect must be brought home to the employer, or proof made that he was ignorant of the same through his own negligence, cited C. & A. R. R. Co. v. Platt, 89 Ill. 143; E. St. L. P. & P. Co. v. Hightower, 92 Ill. 141; C. C. & I. C. Ry. Co. v. Troesch, 68 Ill. 445; Allen v. New Gas Co. 17 English Rep. 420.

When the next of kin are not dependent upon the deceased for support the damages should be only nominal: C. & N. W. R. R. Co. v. Swett, 45 Ill. 197.

Messrs. LINEGAR & LANSDEN, and Messrs. MULKEY & LEEK, for appellee.

I. C. R. R. Co. v. Jones.

WALL, J.  This was an action on the case by the appellee against appellant for the alleged neglect or default of the latter, resulting in the death of Thomas Jones, of whose estate appellee was administrator.  It is averred in the declaration that the deceased was in the employ of the appellant as a brakeman on certain cars which were being transferred down an incline switch track leading from the main track of appellant's road at Cairo to the transfer steamboat Morgan, on the Ohio river, and that by reason of the defective and insufficient character of the links, pins, couplings and other appliances and machinery in use in that service, the car upon which deceased was standing was detached from the train, and though he was using due care, the deceased was thrown from the car and killed.  The case was tried by jury, and plaintiff below recovered a verdict, which the court, upon a motion for new trial, refused to set aside, and the plaintiff had judgment on the verdict.

The incline referred to is something more than twelve hundred feet in length, and descends at the rate of about three feet to the hundred.  It appears that over this incline there is a constant and heavy traffic, as many as sixty thousand cars passing there during the year 1880.  These cars belong to the various roads of the country, and this incline, together with the transfer boat, is an important and essential feature of the business by which the through traffic is accommodated, and without which the present system would be impossible.  It is urged by counsel for the appellee that while this is a necessary branch of the service, it is especially hazardous, and that the company should be held to a very high degree of care in providing safe and sufficient appliances for doing the business, and failing in this it must respond for all damages thereby occasioned.  The accident occurred on the 23d of October, 1880, while deceased was performing the duties pertaining to his employment which was that of "head brakeman" or as termed by some of the witnesses "foreman of the engine." A train of six loaded coal cars of the Iron Mountain Railroad was being taken down the incline.  The deceased was at his proper place, on the rear car, that is, the car nearest the river,

and his assistant, Peake, was on the fourth car from the rear.
The rear car, or perhaps the three rear cars, became detached
from the train. It is not certain, but as insisted by appellee,
and perhaps correctly, the rear car first parted from the train,
and started down the incline ahead of the others, and then
the next two cars broke away, and ran down and overtook the
first which must by this time have been checked by the brakes,
and struck it with considerable force. However, as the first
car passed on the cradle which connects the boat with the in-
cline, or just about that time, Jones was thrown or fell off and
received the fatal injury. He was injured internally, evident-
ly from falling upon the ends of the ties or some other part of
the structure of the cradle or track; was not run over by the
cars, and it is apparent that he must have fallen or possibly
jumped off the car on which he was riding, and in doing so
struck upon the tie or other object which inflicted the injury.

The proximate cause was, of course, the breaking of this car
or these cars from the train, and the undue speed with which
they ran on the cradle. There is some conflict among the
witnesses as to the details, but there is nothing very remark-
able in this. Indeed it is unusual that a number of witnesses
to such an occurrence occupying different standpoints and
seeing different parts of it, should agree perfectly as to all the
particulars. It is not to be expected they should. It appears
from the evidence that the deceased by virtue of his employ-
ment was really in charge of the train. It was substantially
under his command. His duty was to see that the train was
properly made up, that everything was in order, including
couplings and brakes, before starting down the hill, and that
the brakes were properly set, and, generally, it may be said
that he, more than any other person, was responsible for the
management of the whole matter of transferring cars from
the main track to the boat. It also appears that the engine in
use was properly adapted to the service, being provided with
an air brake and extra driving wheels, and that if anything
gave way it must have been a part of the coupling, a link or
a pin, and as believed by witnesses, and as is most probably
the fact, a pin. So that the allegation of negligence must be

I. C. R. R. Co. v. Jones.

considered solely with reference to these appliances, and this reduces the field of inquiry to a very narrow compass—that is, whether the pins in use were insufficient, and if not, whether the appellant was chargeable with negligence in furnishing them, the deceased using proper care.

The plaintiff below offered no testimony directly to the point of the character and sufficiency of the appliances in use, but after showing the circumstances attending the accident, and that similar accidents had occurred there before, rested his case. The defendant below then examined some ten witnesses as to this. Their testimony was all concurrent, and seems to establish the fact that the links and pins in general use were reasonably safe and sufficient for the purpose. The pins used on these particular cars belonged to the Iron Mountain R. R. Company, and while it can not be known whether these pins, which are supposed to have broken, were sound, or whether they may have had some flaw or other latent defect, yet it is fair to consider them of the quality and character generally used on the cars of that road. From the testimony it appears that the pins in general use on that road were somewhat larger and presumably stronger than those used by the appellant, and that those used by the latter were in the opinion of competent experts fully as good as the average in general use on railroads, stronger than some, and reasonably fit and sufficient for all purposes, including the service up and down this incline, and but one road, the Baltimore & Ohio, is known to use a stronger pin than that used by the Iron Mountain. It is shown that in the present stage of experience, the frequent breaking of pins and links is unavoidable, and is regarded as one of the common necessary incidents of the business. This occurs, as the witnesses say, constantly, in the ordinary service, and as is averred by men whose experience should give weight to their testimony, can not be avoided. It is urged by counsel for appellee, that as the service on this incline is peculiar, involving unusual hazard, as shown by the fact that only engines of extra power and with unusual equipments are employed in it, therefore the appellant was bound to provide

links and pins of extra power for this particular work, and that there is palpable negligence in not doing so. This would unquestionably be true, if such links and pins were necessary, and could be practically used; but it is clearly shown that there is a certain uniformity in these appliances in general use on the various roads whose cars cross the river at this point, and that it is not reasonably practicable to use couplings different in a considerable degree from those which are used, and in addition, that in the opinion of experts, there is no real necessity for a stronger link and pin in this service than for that of the main track. This proposition is based upon the statement that while the grade of the incline is unusually steep, yet fewer cars are taken over it at a time than are hauled in a train on the main track, only six being taken on the incline, while forty or fifty are taken over the entire line, making sudden stops and starts at different points; that in the service on the incline, the cars are under the control of an engine of extra power, having air brakes and extra driving wheels, and that in going down, when the operation is performed properly, and as the rules require, the brakes on the cars should be known to be in good order and so well set that the whole train is under perfect control, the cars being pushed by the engine, rather than going of their own motion, and that if, from any cause, a separation should occur, no serious consequences would be likely to follow. Of course much of this is but theory and opinion. If the testimony for the defense is to be believed, it was the duty of the deceased, he having the making up and management of the train under his control, to know that the brakes and couplings were in proper order before starting down the incline, and that the brakes were set properly, so that the transfer could be safely effected, and it would follow that for any omission in regard to these matters he was to blame, unless so far as the employes under his command disregarded his orders or otherwise neglected their duty. As we read the evidence, there is practically no conflict on all these points, and the only grounds upon which the allegation of negligence can be supported must be that this was an extra hazardous part of the service, as shown by

I. C. R. R. Co. v. Jones.

the general nature of it, and by the fact that breaks had oc-·
curred more or less frequently before; that only the ordinary
links and pins in general use were employed in this service,
and that, as a matter of fact, these did break on this occasion,
and such breaking was the proximate cause of the injury and
loss of life in question. The most important feature of this
view is that the couplings did break on this occasion. The
mere fact that the couplings broke on this occasion obviously ·
would not sustain the charge of insufficiency. This is an af-
firmative allegation and should be supported by some proof.
The allegation is that the couplings broke because they were
insufficient, and it is not made out by simple proof that they
did break. Had the declaration averred merely that the coup-
lings parted and gave way, whereby the injury occurred, it
would have been held bad on demurrer, because the employer
does not insure the employe that the machinery is safe, or that
breakages will not happen; hence it is necessary to aver that
the machinery was unsafe and defective, and that the employer
was guilty of negligence in not furnishing a safer and bet-
ter article. When a passenger sues a carrier, he may, under a
general allegation of negligence, including defective cars, etc.,
and mismanagement, make out a *prima facie* case by showing
the accident and injury; but here is a special allegation on be-
half of an employe, who was then himself operating the ma-
chinery, that it was defective, and when the accident occurs,
it may be that it was the result of negligence on the part of
the employe or his co-servants, or of the defect alleged; and
while slight proof of the allegation would suffice if not rebut-
ted, we are not aware that it has ever been held in such cases
that to prove that the machinery gave way without proving
more is enough to sustain the allegation of negligence in fur-
nishing imperfect machinery. I. C. R. R. Co. v. Phillips, 55
Ill. 194; T. W. & W. Ry. Co. v. Moore, 77 Ill. 217; Kranz v.
White, 8 Bradwell, 583; Shearman & Redfield on Neg. Sec.
88. Hence it was no doubt that the appellee sought to prove
other accidents in operating on the same incline; and if it could
have been shown that these casualties occurred under substan-
tially similar circumstances, the evidence would have been

valuable as tending to prove the liability of these couplings to give way and therefore their unfitness for the service. But there was very little proof to establish the coincidence between this accident and those, and we think the value of this testimony, as throwing light upon the main inquiry, not very considerable.

The master is not an absolute insurer to the servant that the appliances furnished are safe and sufficient. As the rule is generally stated in reports and text books, he is only required to use reasonable diligence in providing tools, machinery and other appliances fit and safe for the business. If the servant knows that what is provided is not fit or safe he should quit the employment, and if he does not, but continues in it, he is deemed to have assumed the risk of all such known defects unless he has been coerced or induced by the master to remain, and generally when the defective character of the machinery is patent and is as well known to the servant as to the master, the presumption that he has assumed the risk will obtain. If the defect is obscure and unknown to the servant when exercising due care, but known, or by the exercise of due care might be known to the master, the rule is otherwise. Knowledge of the deficiency must be brought home to the employer or such a state of facts must appear as would make it his duty to have had such knowledge. Shearman & Redfield on Negligence, Secs. 92 to 100; C. C. & I. Ry. Co. v. Troesch, 68 Ill. 545; Camp Point Mfg. Co. v. Ballou, 71 Ill. 417; Richardson v. Cooper, 88 Ill. 270; C. & A. R. R. Co. v. Platt, 89 Ill. 141; Penn. Co. v. Lynch, 90 Ill. 333; E. S. L. P. & P. Co. v. Hightower, 92 Ill. 139. As we have already said, the proof is clear that in the opinion of men familiar with the subject there was no negligence in using the couplings in question. They were deemed reasonably safe and fit, and when the transfer was made in the proper way, they undoubtedly were so. The simple fact that so few breaks had occurred in the vast amount of business done over this incline, strongly supports this view. But if they were, as urged, too light, there was no one who should have known it better than the deceased. He certainly knew

all there was to be known on the subject, and it does not appear that he thought a change was necessary, or that he ever made any objection on that score, and upon well settled principles he must be deemed to have assumed the risk, whatever there was. If the nature of this service required a link and pin of greater size and more strength, he, from his experience there, knew it; he must have known all the facts that were in evidence before the jury as to the couplings used on the cars of different roads, the accidents that had occurred before, and the danger that was involved, and he was therefore chargeable with notice of the fact, if it was a fact, that the couplings in general use, including those in question, were too light. The appellant is a corporation performing all its functions through its employes and those who are charged with the duty of providing appliances and machinery for general use must be governed by circumstances, and would have the right to take, to a considerable extent, the opinion of those whose immediate duty it is to use and work with the appliances so furnished, and to expect that if found unfit or unsafe complaint would be made. All the employes are presumed to be faithful to the interest of the employer as well as careful of their own safety, and it is reasonable to say that they should promptly report any defect likely to endanger their lives or the property under their control. If they make no such complaint it is fair to infer that they regard the appliances as safe and sufficient, or that they knowingly accept the risk involved in the service. In all employments of this nature there is a certain measure of peril and danger necessarily incident to the business, and against which the employer gives no guaranty. The employe is presumed to take this into account when he engages in the service, and he can not recover for damages sustained in consequence.

Looking at the whole record we can not resist the conclusion that the great weight of the evidence is against the plaintiff, and that there is, upon the undisputed facts in proof, no right of recovery. The appellant has assigned error upon various rulings of the court in admitting evidence and in giving and refusing instructions, but in the view we have taken of the case

it is not necessary to discuss these alleged errors, it being sufficient to determine, as we do, that the court erred in overruling the motion for new trial, upon the ground that the verdict was contrary to the evidence. The judgment is reversed and the cause remanded.

Reversed and remanded.

BAKER, P. J., took no part in the decision of this case.