## No. 11,345.

### MRS. HENRIETTA HELM, INDIVIDUALLY AND AS TUTRIX, VS. EDWARD AND JAMES O'ROURKE.

Where a widow sues for the death of her husband, caused by negligence of defendants, there is no misjoinder of parties plaintiff, if she sues individually and as tutrix of her minor child, issue of her marriage with deceased.

Where the parties are liable *in solido*, and each is cited, they are all before the court, and the fact that the petition alleges that the injury was inflicted by a commercial firm, composed of the individuals who are liable, is not sufficient for the dismissal of the suit, although the firm had been dissolved at the time of the institution of the suit. The petition discloses a cause of action when it set

NEW ORLEANS, FEBRUARY, 1894. 179

Helm, as Tutrix, vs. E. and J. O'Rourke.

out the manner in which the deceased was killed and charges negligence on part of defendants, and the absence of contributory negligence on part of deceased.

A servant, an "all-around workman," subject to the orders and directions of the master, whenever he is called upon to work in pursuance of conditions created by the master, has the right to assume superior knowledge, judgment and skill in the master, under whose orders he is immediately acting, and to believe that he will be protected from danger.

APPEAL from the Civil District Court, Parish of Orleans.
$\quad$ Rightor, J.

---

### T. M. Gill for Plaintiff and Appellee:

1. Knowledge, experience, care and skill are required in testing a boiler. U. S. Revised Statutes, Sections 4404, 4418, 4427, 4429, and 4429. Edward's Steam Engineer's Guide, pp. 126-127, quoted pp. 15-16 of this brief.

2. It was the act of the O'Rourkes that caused the damages, and they must repair it. R. C. C. 2315.

3. Mr. Webster's definition of the word USE is: "The act of handling or employing in any manner or for any purpose." The demolisher of a building is not using (to adopt defendant's construction of the word) the building, but demolishing to convert its material into marketable lumber—to sell it for use—yet he is liable for any damages he may cause. 39 A. 1011.

4. It was the duty of Frank Helm to go to Edward O'Rourke whenever he called him. The master orders and the servant obeys and executes. 112 U. S. 393.

5. Servant has the right to assume superior knowledge, prudence, judgment and skill in his master, and that the master will not jeopard his life or person but guard him from all danger. The master's duty is to know the danger, if any exists. He can't require superior knowledge, judgment or skill from his servant. Servants are only required to know of patent but not latent defects, and if he knows of defects it would not bar recovery, unless he knew they were necessarily dangerous. It is absolutely necessary, to bar recovery, that the master should be free from all negligence, even if the servant assumed the risk in his employment. 39 A 1011; 37 A. 635; 40 A. 182 to 183; 106 U. S. 700-702; 41 A. 964; 100 U. S. 216, et seq.; 112 U. S. 293; 12 F. R. 732; 48 F. R. 914, 919; 116 U. S. 642.

6. The burden was upon defendants to prove for what F. Helm was employed, to prove if he was employed to test or witness the testing of boilers, and that he had the capacity to do so, etc., and that Edward O'Rourke had the skill to test boilers and was free from all fault. Having made no proof of the above requirements the presumptions are against them. 15 A. 664; 35 A. 841; 20 A. 96.

7. The judgment is small for the damages suffered. Twenty-five hundred dollars has been allowed for eighteen hours' suffering. 36 A. 708. Helm suffered 168 hours. This authority would authorize $23,333.33 1-3 damages.

---

### Jas. Timony and Moise & Cohn for Defendants and Appellants:

1. (a) Whatever is necessary to be alleged to show a cause of action must be expressly alleged.

(b) Inference and implication can not be used in lieu of positive allegation.

2. No fact can be shown unless it has been alleged. 1 L. 214; 4 R. 465; 9 An. 117; 14 An. 355.

3. (a) The allegations of a petition should exclude every hypothesis upon which the non-liability of defendant could be predicated.

(b) Its allegations should be such that defendant admitting them, and the law justifying, judgment should go against him.

4. (a) Whatever must be proved in order to recover must necessarily be alleged. 5 M. 691; 13 L. 52; 2 R. 498; 4 R. 428; 1 An. 556; 13 An. 124; 14 An. 120; 20 An. 354; 24 An. 159.

(b) If facts alleged are not sufficient when proven to recover, the petition necessarily shows no cause of action.

5. (a) The plaintiff is presumed to have stated every fact which he can prove.

(b) Facts not stated it will be presumed did not exist

6. A skilful mechanic, employé in a boiler manufacturing establishment, called on to witness the "testing" of an old boiler by his employer, takes the risk of his employment in answering the call, and can not complain if injured by its explosion during the operation, when the danger was not increased by any fault of the employer, and the method of testing was not unusual or uncommon.

7. (a) The boiler was being tested and deceased was called onto witness the test.

(b) No allegation in petition of fault or negligence in the operation of testing.

(c) No allegation that it was not part of deceased's duty or function of his employment.

(d) No allegation that deceased was not familiar with operation of "testing."

(e) An allegation that he was skilful, necessarily must have known.

(f) No allegation danger was increased.

8. (a) The court will take judicial notice that in boiler works boilers are tested.

BECAUSE 1st. The United States Government requires it for marine boilers.

2d. The city government did require it.

3d. It would be negligence not to test.   9 Fed. 877; 10 Fed. 140.

9. (a) The court will not presume it uncommon or unusual, in order to aid a petion, when it does not so allege it to be.

(b) To have sold or used an old, rejected and condemned boiler without "testing" before or after repairing would have been criminal negligence.

(c) It is the obligatory duty of a boiler maker to test.

10. (a) No allegation of cause or reason for calling deceased.

(b) Allegation that he was skilful.

(c) Presumption called for a purpose.

(d) That purpose founded on his skilfulness.

11. (a) No allegation that employer had no right to call him.

(b) If without right deceased could have refused to come.

(c) Coming, therefore, he voluntarily assumed the risk.

12. (a) No allegation that testing was before or after repairing.

(b) No allegation that it was with cold or hot water—steam or compressed air.

13. The object of "testing" is to test.

14. (a) To test a thing is to try its strength, power and endurance, also its weakness.

(b) To test a boiler is experimenting by pressure to see what pressure it will stand.

(c) The fact of "testing" is putting a doubt into action; to verify its truth or demonstrate its falsity.

(d) To test a boiler is to propound to it interrogatories in the shape of deeds and to take results for answers.

(e) To test a boiler is to probe it for unseen defects.

15. An essential and necessary part of defendant's business was to test, not only as part but as an obligatory duty.

16. Deceased was called to witness the questions in the shape of deeds, put to the boiler, and necessarily to hear the answers, in the form of results.

17. The boiler was not in use, nor being used.

18. The fact of "testing" shows an intent to use, if fitted for use, which denies its use and concedes its unfitness for use.

19. This is not an action for the use of defective machinery.

20. The petition does not charge the boiler unfit for "testing."

21. Testing a boiler involves danger.

22. Employés assume the risks incident to their employment, and unless the employer increases those risks he is not liable for injuries resulting. 38 An. 156; 35 An. 1166; Rorer on R. R. 1198; Pierce on R. R. 379; 109 U. S. 484.

23. A man voluntarily assuming a position of danger can not recover for injuries. 17 Fed. 882; 24 Fed. 309, 906, 124—and authorities in brief.

24. An employé knows the risk of the business as well as an employer. See Lord Abinger's ruling cited approvingly by our court (in brief).

---

The opinion of the court was delivered by

McENERY, J. The petitioner alleges that the defendants, composing the commercial firm of Edward & James O'Rourke, are indebted to her individually and as tutrix of her minor child in the sum of twenty thousand dollars, "for this, that on or about the 16th day of May, 1891, while petitioner's husband, Frank M. Helm, was working at the furnace where he was employed in the boiler works of the aforesaid firm of Edward & James O'Rourke, in this city, he was called from said work by Edward O'Rourke, a member of said firm of Edward & James O'Rourke. to witness the testing of a boiler, which, upon his arrival exploded and he was thrown many feet distant and struck by many fragments of said boiler, and so injured, notwithstanding the best of medical skill and care, as to cause his death, after suffering seven days great pain and agony, on or about the 23d of May, 1891. *   *   *   *   *

"That petitioner's husband was guilty of no fault, but that all the injuries, suffering, agonies, death and damages aforesaid were caused solely by the carelessness, imprudence, gross negligence, fault and want of skill of the aforesaid firm of Edward & James O'Rourke, and Edward and James O'Rourke individually. That said boiler was old, rejected and condemned before the purchase of the same by the said defendant firm of Edward & James O'Rourke, and was not only

unsafe, but utterly unfit for use, as they well knew, and which peti-
tioner's husband did not know."

The prayer is for judgment for said sum of $20,000 against the
commercial firm of Edward & James O'Rourke and James O'Rourke,
individually, *in solido*, and for the same amount jointly against the
heirs of Edward O'Rourke, deceased.

The defendants were all cited and were before the court.

· To this petition exceptions were filed—first, that at the time of the
service of the petition and citation the firm had been dissolved, and
that the defendant James O'Rourke had no authority to answer for
said firm, and that he could not be cited with another party, but that
citation and petition should be served on him separately. The de-
fendants, if liable, were bound *in solido*. They were all cited. All
parties in interest were therefore before the court.

Second, that the petition is vague and shows no cause of action,
and that it is a misjoinder of parties plaintiff. The petition is ex-
plicit in showing the manner in which the deceased, Frank Helm,
met his death, and it explicitly charges and avers that it was caused
by the negligence of defendants. The only facts at issue were the
negligence of defendants, and the absence of contributory negli-
gence on the part of deceased. The first is averred and the second
negatived by averments. There was no misjoinder of parties plain-
tiff, as both the widow and child have an interest in the damages if
any were due for the death of the husband and father.

The exceptions, therefore, were properly overruled.

The defendants answered, pleading a general denial and specially
averring that the testing of the boiler was done by defendant's brother
and partner, who was seriously injured at the time the explosion oc-
curred; that Frank M. Helm was a skilled mechanic; that he had in-
spected the boiler, and from his report Edward O'Rourke believed
the boiler could stand the test; that the explosion was caused by no
fault of defendants, and that the accident was one of that character
which is the risk of the business in which said Helm was engaged;  ·
that the boiler had been repaired according to the instructions of said
deceased Helm, and many repairs were put on the same which he
had not recommended, and that it was thoroughly repaired when
tested, and that the explosion was one of those accidents which will
happen in despite of every care and caution. Contributory negligence
on the part of Helm, the deceased, is also averred.

There were four trials by jury. The first trial was in favor of plaintiff, the jury returning a verdict of $8000. This was set aside. The case was again tried on the same evidence by agreement of counsel, and a verdict in favor of plaintiff for $20,000 was returned. A new trial was granted. On the third trial the jury failed to agree, and on the fourth and last trial, on the same evidence, a verdict was returned for $8000 and a judgment in favor of plaintiff rendered thereon. From this judgment defendants appealed.

The firm of James & Edward O'Rourke were engaged in making new boilers, buying second-hand boilers and repairing them if necessary, for sale, and repairing boilers for other parties. The firm bought two boilers from a blacksmith in Algiers. These boilers had been used for many years on the McLellan Dry Dock, and had undergone many repairs. They had become useless, worn out and rotten to the extent that they could no longer be repaired, and were discarded and condemned by the owners. They were unsalable, even for old iron, and to get rid of them arrangements had been made to throw them in the river. Finally they were given to the blacksmith Daniels, to be used as water tanks. From Daniels, Edward & James O'Rourke purchased them for a trifling sum. These boilers were moved to the works of the defendants and remained there some time before repairs were made upon them. During this time, until a short time before the test which ended so tragically, Frank M. Helm, the deceased, was not employed at the boiler works, and it is not shown that he was acquainted with the history of the boilers. Frank M. Helm was employed at the furnace. He was a skilled mechanic, and handy at any work about the establishment. He was, as stated in the testimony, an "all-around man." It was not his special business to test boilers. Edward and James O'Rourke were their own foremen, and the employees of the establishment acted under their instructions and obeyed their orders, doing what work was imposed upon them by their employers.

It appears by the testimony of James O'Rourke that it was not the business of any particular employee to test the boilers, and that a workman who happened to be out of a job was selected for this purpose. The deceased, Helm, was not out of a job, as he was employed at the furnace. It does not appear by the testimony, except that of James O'Rourke, that Helm, the deceased, worked on this boiler, which was purchased from the blacksmith, Daniels.

Those who worked on the boiler named George Helm, brother of deceased, as the mechanic who did the work on it, putting in the new crown sheet and some of the braces, which were made by Frank M. Helm at the furnace or forge. There is some confusion in the testimony as to whether there was one or two cold water tests of the boiler. But there was certainly one, made after the new crown sheet was put in, under a pressure, stated by one witness, at sixty-five pounds, and another at thirty. Under this test the boiler gave way, and Edward O'Rourke ordered George Helm to caulk, that is to rivet the defective point in the boiler. The defect was in the old iron. After the explosion the boiler gave evidence that it was the old iron around the new crown sheet which gave way.

Experts who, from the responsible positions they occupy, are familiar with the testing of boilers say that after defects have been shown by the cold water test it would be unsafe, in fact rash, to resort to the steam test which the boiler was undergoing the day after the cold water test without repairing the defective portions of the boiler. And these experts also state that no more steam pressure should be employed in testing than that used in the cold water test. P. H. Kelly, a boiler maker and superintendent of the Whitney Iron Works, says that no practical man will test a boiler by steam pressure before he has convinced himself by hydrostatic test that the boiler will hold a certain amount of hydrostatic pressure.

It does not appear that after the cold water test and the defects were exhibited, and the boiler caulked or riveted, that any other hydrostatic test was made, but that a steam test was employed the next day at a pressure of at least eighty-five pounds.

We conclude that the defendants were negligent in attempting to test an old boiler beyond the ability of any one to repair or make safe, and that they were negligent in putting on the steam test at a pressure in excess of the hydrostatic test, even if the boiler had shown no defects by said test. And that they were grossly negligent after the defect by hydrostatic test had been exhibited, by resorting to the steam test without satisfying themselves again, after the repairs, by hydrostatic pressure, that it was safe to resort to the steam test. Phillips vs. Ill. C. R. R. 49 Ill. 234.

Frank M. Helm, the deceased, was employed at the forge or furnace, and was going to his work at the forge, and was some thirty feet away from the boiler when Edward O'Rourke called to him and

said he wanted him.   He responded to this call and went to Edward O'Rourke, who was superintending the testing of the boiler by steam. At this time there were eighty-five pounds pressure on the boiler and Edward O'Rourke instructed Claude Helm to put on one hundred pounds pressure.   He started to put on more steam, and it was at this time that his brother, Frank M. Helm, was called by Edward O'Rourke.   Claude Helm was instructed to call James O'Rourke, the other member of the firm.   Frank M. Helm and Edward O'Rourke were left standing at the boiler, when he left to call James O'Rourke. He was in the office not very far away, and started immediately with Claude Helm to where the boiler was being tested, when within thirty feet of the boiler it exploded.

It is in evidence that the employees of defendants' establishment obeyed what orders were issued, and that Frank M. Helm being handy and expert in all things connected with boiler making was called upon to do almost any kind of a job.

But it was not his business to test boilers.   He was not employed specially for this purpose.   This duty was assumed by Edward O'Rourke.   Frank M. Helm took no part in directing the operations, but was present by invitation of his master and superior, and was under his orders.   He was not, therefore, employed in an occupation, the risks of which he assumed.   The authorities cited by defendants have no bearing on this point, as the facts do not bring the case within them.   Frank M. Helm being in the service of defendants as a general all-around workman, subject to the orders and directions of his superiors, whenever he was called upon to work in the presence of conditions created by his master and superior, had the right to assume superior knowledge, skill and judgment in his superior, under whose orders he was immediately acting, and that he would not expose him to needless danger.

In the case of Tutrix vs. Sellers & Co., 39 An. 1011, Mr. Justice Fenner, in an elaborate and able opinion, thus states the law:

"When the master has created the danger he is bound to guard against it, and if he himself does not know or believe that the danger exists he can not require superior knowledge and judgment from the servant."

To review the instant case at length would be only to repeat the views expressed in the opinion of Tutrix vs. Sellers, and a collation and reference to the authorities cited.

It is only necessary to state that the defendants created the danger which the deceased, Helm, was instructed and ordered to confront. They are therefore liable in damages for their negligence in putting in operation cause which led to the death of Frank M. Helm.

There are circumstances attending this case that impress us with the belief that the amount of damages assessed by the jury is excessive. The verdict of the jury was probably induced by testimony permitted to go to the jury showing the amount of property owned by defendants.

We will amend the judgment and fix the amount of damages at three thousand dollars.

It is, therefore, ordered, adjudged and decreed that the judgment appealed from be amended so as to fix the amount of damages at three thousand dollars; in all other respects the judgment is affirmed, appellees to pay costs of appeal.