Argued October 9, affirmed November 13, 1923.

## P. E. HICKS v. PENINSULA LUMBER COMPANY, A CORPORATION.

### (220 Pac. 133.)

**Master and Servant—Owner of Premises Owes Contractor's Employees Duty of Reasonable Care.**

1. A company contracting for the doing of work on its premises by another owes the same duty to the latter's employees to keep the premises and place of work in a reasonably safe condition as if they were its own employees.

---

1. Care required of master in providing appliances, see note in 1 Ann. Cas. 340.

Meaning of term "appliance" as used in law of master and servant, see note in 19 Ann. Cas. 151.

Steam—High Degree of Care Required.

2. Steam is such a dangerous agency as to require a high degree of care of those engaged in its production and use.

Negligence—Owner of Steam Boilers Required to Exercise Ordinary Care to Safeguard Contractor's Employee.

3. A corporation letting a contract for the installation of a mud-drum under a steam boiler on its premises *held* required to take such reasonable precautions in proportion to the danger of steam being ejected into the drum through a blow-off pipe from another boiler, as an ordinarily prudent man, knowing that the contractor's employee was ignorant of the danger, would have employed, under the circumstances, to safeguard him.

Negligence—Question for Jury.

4. While the mere happening of an injury is insufficient to raise an inference of negligence, the case is for the jury, where proof of the accident is accompanied by proof of facts and circumstances from which an inference of negligence may or may not be drawn.

Negligence—Finding of Negilgence as to Contractor's Workman Scalded by Steam Warranted.

5. In an action for injuries to a contractor's employee while installing a mud-drum under a steam boiler on defendant's premises, evidence *held* sufficient to authorize the inference by the jury that valves in pipes connecting the blow-off tank with the mud-drum in which plaintiff was working were negligently left open when another boiler was blown off, thereby causing the steam to "kick back" and scald plaintiff, and that defendant failed to exercise due care to ascertain whether the valves were open before blowing off the boiler.

Negligence—Negligence as to Contractor's Workman Scalded by Steam Held for Jury.

6. In an action for injuries to a contractor's employee from steam ejected into a mud-drum being installed by him under a boiler on defendant's premises, defendant's evidence that its employee closed the valves in pipes connecting the blow-off tank with the mud-drum and did not open them before plaintiff's injury *held* insufficient to authorize a directed verdict for defendant, in view of evidence that the valves were open when the steam was turned into the pipes and that defendant failed to exercise due care to ascertain whether they were open before blowing off the boiler.

Master and Servant—Filing Claim for Compensation not Necessarily Election Precluding Suit Against Third Party.

7. The mere filing of a claim for compensation by a contractor's employee, injured while doing work on another's premises under a contract let to his employer, followed by an award of the full statutory compensation, does not necessarily constitute an election to take under the act or effect an assignment of his right of action against the third party to the state under Section 6616, Or. L., which merely requires that such election be in advance of any suit.

**Master and Servant—Election to Take Compensation Instead of Suing Third Person not Presumed, Where Servant Acts in Ignorance of Obligation to Elect.**

8. An election, under Workmen's Compensation Act (Section 6616, Or. L.), by a workman injured while away from his employer's plant, to take under the act, instead of suing a negligent third person, will not be presumed, where he acts in misapprehension of his rights and in ignorance of his obligation to elect especially when no other person's rights are prejudicially affected.

**Master and Servant—Payment of Nurse Hire by Accident Commission Does not Vest State With Interest in Workman's Right of Action Against Negligent Third Party.**

9. Payment of nurse hire by the Industrial Accident Commission as first aid to a workman injured while away from his employer's plant is no part of his compensation under Section 6628, Or. L., and cannot be invoked to vest in the state, under Section 6616, an interest in his right of action against a negligent third party.

**Master and Servant—Acceptance of Compensation Held not Election so as to Work Assignment to State of Right of Action Against Negligent Third Party.**

10. Receipt and acceptance of two weeks' compensation awarded an injured workman *held* not an election to take under the Compensation Act so as to work an assignment to the state, under Section 6616, Or. L., of his right of action against a negligent third party, where the sum paid was promptly returned to and accepted by the Commission with the understanding that the state's claim was discharged.

**Appeal and Error—Submission of Question Whether Injured Workman Elected to Take Under Compensation Act Held not Reversible Error.**

11. Submission to the jury of the question whether one suing for injuries sustained while doing work on defendant's premises under the latter's contract with his employer elected to take under the Workmen's Compensation Act by filing a claim and accepting two weeks' compensation, which he subsequently refunded, *held* not error of which defendant could complain.

From Multnomah: GEORGE W. STAPLETON, Judge.

Department 2.

'AFFIRMED.

For appellant there was a brief over the names of *Mr. C. A. Hart* and *Messrs. Carey & Kerr*, with an oral argument by *Mr. Hart*.

For respondent there was a brief over the names of *Mr. John W. Kaste* and *Mr. Jay Bowerman,* with an oral argument by *Mr. Kaste.*

McCOURT, J.—This is an action brought to recover damages for personal injuries received by plaintiff, which he alleges were caused by the negligence of the defendant. From a verdict and judgment in favor of plaintiff, defendant appeals.

The injury for which plaintiff seeks damages occurred on May 3, 1921, at the lumber manufacturing plant of the defendant while plaintiff, an employee of the Willamette Iron and Steel Works, was engaged, with other workmen, in the installation of a mud-drum under certain of the boilers in defendant's plant. Plaintiff was working in the mud-drum, when defendant's foreman ejected steam from a live boiler into a blow-off pipe-line that had been connected with the mud-drum by defendant's employees a few hours previously, thereby scalding plaintiff.

Plaintiff's employer, the Willamette Iron and Steel Works, was operating under the workmen's compensation law, but as the injury happened away from the employer's plant, plaintiff had a right to take compensation, or at his election, seek his remedy against the defendant if the injury to plaintiff was due to the negligence or wrong of defendant.

Immediately after he was injured, plaintiff applied to the Industrial Accident Commission for compensation, and received a first payment for temporary disability. Shortly thereafter, and while plaintiff was in the hospital, he returned to the Industrial Accident Commission the amount of such first payment, and notified the Commission that he elected to seek his remedy against the defendant, and at

the request of the Commission, plaintiff executed a
formal writing declaring that election.

Two questions are presented by this appeal, both
raised on the trial by a motion for nonsuit and a
motion for a directed verdict: (1) Whether there
was any evidence produced at the trial in support
of any of the charges of negligence contained in the
complaint, and (2) Whether after the accident there
was an election to take compensation under the
workmen's compensation law and a resulting assign-
ment of the cause of action against the defend-
ant, if any existed, to the state.

The determination of these questions requires an
examination of the evidence.

Defendant is engaged in the manufacture of lum-
ber. Its plant, which is located on the Willamette
River at St. Johns in Portland, is furnished with
steam by a battery of nine boilers, the easterly three
of which were out of commission at the time of the
accident. Underneath these three boilers there is
located a cylindrical drum, thirty feet long and thirty
inches in diameter, known as a mud-drum, running
crossways of the boilers, the east end of which is
flush with the brick wall inclosing all the boilers
above mentioned. At the end of the mud-drum and
in this brick wall, there is a manhole, and below the
manhole is a pipe leading along the floor and out
through the wall of the building to what is known
as the "blow-off" tank or "sump" tank located under
the floor of the dock just outside the boiler-room
building. In this pipe which leads from the mud-
drum to the blow-off tank outside the building, there
are two valves; one ordinarily used and the other an
emergency valve. These valves are located just in-
side the wall of the boiler-room building. The mud-

drum is designed to drain the boilers and to carry off sediment from the water in the boilers. When the boilers are drained or "blown off," the water or steam passes into the mud-drum, thence through the drain pipe (the valves being first opened) to the blow-off tank outside the building. The blow-off tank is similarly connected with all of the boilers. Its use is necessary in order that steam and hot water from the boilers (or their mud-drums) shall not be discharged directly from the boilers. The blow-off tank has a vent for the escape of steam and a drain emptying into the river. When conditions require the blowing off of a boiler, the fireman in charge opens the valve in the pipe leading from the boiler (or its mud-drum) to the blow-off tank, so that when the steam is released from the boiler, it is discharged through the blow-off tank. If the valves in any of the pipes connecting the blow-off tank with other boilers (or their mud-drums) are left open at such a time, some of the steam coming into the blow-off tank may "kick back" up those pipes to the mud-drum under the other boilers.

This is what happened when plaintiff was hurt. He and another workman were in the mud-drum under the easterly three boilers when a boiler at the far end of the boiler-room was blown off. The steam was discharged in the usual way into the blow-off or sump tank, but because the valves in the pipe which connected the blow-off tank with the mud-drum under the three easterly boilers were open, some of the steam traveled from the blow-off tank up this pipe and into the mud-drum and caused plaintiff's injury.

As above stated, plaintiff was an employee of the Willamette Iron and Steel Works. That com-

pany had contracted with defendant for the construction and installation of a new mud-drum under the three easterly boilers, the installation to include the placing of the mud-drum under the boilers, but not to include the pipe work necessary to connect the boilers with the water supply to them or the mud-drum with the blow-off tank. Under the contract between defendant and the Willamette Iron and Steel Works, before the latter entered upon the work, defendant was required to, and did, disconnect the boilers, under which the mud-drum was to be placed, from the blow-off tank, and in so doing, removed all the steam pipes connecting the mud-drum with the blow-off tank. Defendant was also required to, and did, disconnect the pipes which supplied water to the boilers. On Saturday, April 30, 1921, the foreman in charge of the installation work, reported to the chief engineer of defendant, that the mud-drum was in, and ready to be tested. The chief engineer of defendant thereupon directed his pipe-fitters to make connection for the water supply necessary to make the tests. Defendant's pipe-fitters immediately made the connections, as directed, and also attached to the mud-drum that portion of the drain-pipe which was equipped with valves, as aforesaid, and which extends from the manhole in the mud-drum to a point just outside the wall of the boiler-room, so that water could be retained in the mud-drum while the tests were being made and could be drained from the boilers and the mud-drum upon the floor of the dock outside the building when the tests were completed.

Tests were made of the mud-drum on Saturday evening and Sunday, by filling the boilers with cold

water, and after the tests the water was drained out
through the pipe referred to, on the floor of the
dock outside the building. The tests developed de-
fects, which were attempted to be cured by calking.
This proved unsuccessful, and the foreman of the
Willamette Iron and Steel Works finally determined
to cut out the leaky rivets and put in new ones. On
Monday, May 2d, the faulty rivets were removed,
and in the evening at 5 o'clock a new crew of the
Willamette Iron and Steel Works, including the fore-
man above mentioned and plaintiff, began the work
of putting in new rivets. In the meantime the pipe-
fitters of defendant connected the mud-drum with
the blow-off tank, so that the mud-drum no longer
drained on the floor of the dock outside the building,
but was connected up with the blow-off tank and the
exhaust steam line connecting with all of defendant's
boilers. No notice that this connection had been
made was given to plaintiff, his foreman or any
of the men working with him. The employees of
defendant in charge of the work, who connected the
mud-drum with the blow-off tank, testified that when
the pipe-fitters completed their work of installing
this pipe and connecting it with the blow-off tank,
one of them at once notified defendant's day fireman
then in charge, and in the presence of the day
fireman, closed the valve nearest the mud-drum.
Later in the day the second-shift fireman, who took
charge at 2 o'clock P. M., testified that he had occa-
sion to observe these valves, and noticed that the
valve nearest the mud-drum was properly closed.
The reriveting work which began Monday evening
required one of the men to get inside of the mud-
drum, going in through the manhole at the end.
Later a second man was sent in by the foreman of

the Willamette Iron and Steel Works, so that there were two, plaintiff and another, in the mud-drum when steam was turned into the same, as hereinafter stated.

At about 2 o'clock in the morning of Tuesday, May 3d, defendant's night fireman blew off one of the boilers then in use, it being customary to do this once or twice during the night. The valves in the pipe leading from the blow-off tank to the mud-drum, in which plaintiff and his fellow-workman were at work, were then open, and the steam which came into the blow-off tank from the boiler then blown off by the fireman traveled up through this connecting pipe, passed the open valves and into the mud-drum where the men were working, and severely burned and scalded them. The plaintiff and his fellow-workmen, including his foreman, all testified that they did not know that the mud-drum had been connected with the blow-off tank, and that they had not opened the valves in the pipe which made that connection, and had not touched the same. It does not appear from the evidence that any persons not in the employ of defendant, other than the Willamette Iron and Steel Works crew, of which plaintiff was a member, had access to the valves in question.

Plaintiff by his complaint charged the defendant with negligence in the following particulars: (1) In connecting the steam line between the mud-drum and the blow-off tank prior to the completion and acceptance of the installation of the mud-drum; (2) In permitting the valve or valves in the steam line to be, and remain, open while plaintiff and his fellow-employees were at work in and about the mud-drum; (3) In blowing off the boilers in operation in de-

fendant's plant; (a) without warning to plaintiff; (b) without first exercising care and caution to ascertain whether or not the valves in the exhaust steam line were open; and (c) without first disconnecting the steam line or closing the valves therein.

Defendant contends that no evidence was adduced by plaintiff to establish any of the above specifications of negligence, and therefore the cause should not have been submitted to the jury. Counsel argues that the defendant owed the plaintiff no such exacting obligations as are imposed by common law and statutory law upon an employer; that defendant was not required to make or keep the place of work safe, except only that when its agents had knowledge of plaintiff's presence in the plant and knew also that the ordinary operation of the plant might cause injury, the duty existed to refrain from such acts, and that, in the absence of direct evidence that someone acting for the defendant opened the valves and permitted the steam to go out of its course and into the place where plaintiff was working, there was no basis for imposing liability upon the defendant company.

1. The conditions under which plaintiff was employed and working upon the defendant's premises imposed upon defendant the same legal obligation and duty to keep the premises and the place at which plaintiff was at work in a reasonably safe condition, as would have rested upon it if plaintiff had been employed by defendant at the time and place of his injury: Wood's Master and Servant (2 ed.), § 337; 18 R. C. L. 586; note, 46 L. R. A. 33, 52; *Wilson* v. *Valley Improvement Co.,* 69 W. Va. 778 (73 S. E. 64, Ann. Cas. 1913B, 791, 45 L. R. A. (N. S.) 271); *Channon* v. *Sanford Co.,*

70 Conn. 573 (40 Atl. 462, 66 Am. St. Rep. 133, 41 L. R. A. 200); *Roche* v. *Llewellyn Iron Works Co.,* 140 Cal. 363 (74 Pac. 147), in which the facts are much like those in the instant case; *Samuelson* v. *Cleveland Iron Mining Co.,* 49 Mich. 164 (13 N. W. 499, 43 Am. Rep. 456); *Johnson* v. *Spear,* 76 Mich. 139 (42 N. W. 1092, 15 Am. St. Rep. 298); *Coughtry* v. *Woolen Co.,* 56 N. Y. 124 (15 Am. Rep. 387); *Coughlin* v. *The Rheola,* 19 Fed. 926; *Cliffe* v. *Pacific Mail S. S. Co.,* 81 Fed. 809.

In the case of *Wilson* v. *Valley Improvement Co., supra,* Mr. Justice POFFENBARGER lucidly states the rule, which is sustained by the foregoing authorities, as follows:

"The owner of a mill or other place of business, in requesting another person to send his servants there to perform work beneficial to the owner, extends an invitation to such persons as are sent in obedience to the request, and, when they arrive, they are there on business for the owner of the property, as well as their master, and are therefore entitled to exact the same sort of duty from the owner of the premises as if they were in fact his own servants."

The authorities above cited announce the further rule, that where an employer sends his employee to do work upon the premises of another, at the request of, or under contract with, the latter, and the employee, without fault on his part, is injured by the negligent failure of the owner of the premises to keep them in a reasonably safe condition, such employee has his remedy against the negligent owner, and the employer will not, under such circumstances, be liable to his employee, in the absence of actual notice of a defect or danger, unless he has expressly or impliedly assumed such obligation. Also

see *Foster* v. *Conrad,* 261 Fed. 603; *Seminole Graphite Co.* v. *Thomas,* 205 Ala. 222 (87 South. 366).

Defendant was not an insurer of the safety of plaintiff against injury from the steam generated and used by defendant in its plant where plaintiff was working. Under the circumstances shown by the evidence, it was incumbent upon the defendant to exercise ordinary care for the safety of plaintiff, or a degree of care corresponding to the danger involved: *Ahern* v. *Oregon Telephone Co.,* 24 Or. 276, 294 (33 Pac. 403, 35 Pac. 549, 22 L. R. A. 635).

In the case last cited the court observed:

"Where the danger is great, a high degree of care is necessary, and the failure to observe it is a want of ordinary care under the circumstances."

2. Steam is so far a dangerous agency that a high degree of care is required of those engaged in its production and use: *The New World* v. *King,* 16 How. (U. S.) 469 (14 L. Ed. 1019, see, also, Rose's U. S. Notes); *Illinois Cent. R. Co.* v. *Phillips,* 49 Ill. 234; Id., 55 Ill. 194.

It is obvious that if the valves in the drain-pipe which has been described had been closed at the time the live boiler was blown off by defendant's night fireman, plaintiff would not have been injured.

Defendant asserts that plaintiff did not offer any evidence to account for the valves in the steam pipe being open when the above-mentioned boiler was blown off, and defendant contends that the jury just as readily might have inferred that the valves were opened by plaintiff, his fellow-workmen or some third person, as by the employees of defendant, and in that view of the case, it is claimed that the question of responsibility for the valves being open was

left to speculation, entitling defendant to a judgment of nonsuit.

The place in which plaintiff was working was entirely safe so long as steam from the live boilers in the plant was not permitted to enter the boilers or mud-drum in which plaintiff and his associates were working; when the steam line was connected, the place became dangerous. Defendant did not notify the plaintiff, his fellow-workmen or his foreman, that the boilers in which they were working had been connected with the steam line; such knowledge as they had respecting that matter entitled them to believe that they were not connected with the steam line.

3. It was the duty of defendant to exercise care and vigilance, to prevent injury to plaintiff, proportioned to the danger to be avoided; to that end, defendant was required to take such reasonable precautions as an ordinarily prudent man, under the circumstances, knowing that plaintiff was ignorant of the danger which threatened him, would have employed for safeguarding plaintiff.

4. While it is firmly established that, in the absence of facts from which negligence may be inferred, defendant is presumed to have exercised due care, and the mere happening of the injury is insufficient to raise an inference of negligence, it is also a settled rule that where proof of an accident is accompanied by proof of facts and circumstances from which an inference of negligence may or may not be drawn, the case is one for determination by the jury: *Geldard* v. *Marshall,* 43 Or. 438, 444 (73 Pac. 330); *Rogers* v. *Portland Lumber Co.,* 54 Or. 387, 392 (102 Pac. 601, 103 Pac. 514); *Devroe* v. *Portland R. L. & P. Co.,* 64 Or. 547 (131 Pac. 304).

5. The admitted fact of the injury to plaintiff was accompanied by' the additional facts and circumstances shown by plaintiff's evidence, that when the boiler tests were completed on Sunday, the water was drained from the mud-drum on to the floor of the dock just outside the boiler-room, and the valves in the drain-pipe were at that time left open; on Monday defendant connected the steam line to that pipe, at which time the valves were open; a few hours later, without any notice to plaintiff, or those responsible to him, that the steam line had been connected, defendant's night fireman turned a large volume of steam into the pipe, and the valves were then open. Defendant had exclusive control of those pipes, and of the valves therein, and of the steam that was injected into the pipes. Strangers did not have access to the pipes or the valves. Plaintiff and his associates testified that they did not open the valves or handle them in any way.

The facts above recited, accompanying the fact of the injury, justified the jury in drawing the inference that the valves were open at the time steam was turned into the pipes, as the result of negligence, and that defendant was responsible for that negligence, and also authorized the inference that defendant failed to exercise due care to ascertain whether or not the valves in the exhaust steam line were open, before blowing off the live boiler in defendant's plant.

6. The evidence of the defendant, given in support of its defense, to the effect that its employees closed the valves upon connecting the steam line, and did not thereafter open them prior to plaintiff's injury, did not authorize the court to direct the jury to return a verdict for the defendant.

7. Defendant in its answer pleaded, and upon the trial urged, that the right of action of plaintiff against defendant, if any, was vested in the state for the benefit of the accident fund, and that the state was the only proper party plaintiff in an action to enforce that right.

Immediately following his injury, plaintiff was taken to the St. Vincent's Hospital in Portland, Oregon, for first aid treatment. A few hours later, and upon May 3, 1921, the date of plaintiff's injury, Miss Vera Hammond, who was then employed by the Industrial Accident Commission, called upon plaintiff at the hospital, and while there, furnished plaintiff a blank form of Workman's Claim for Compensation, prepared plaintiff's claim thereon, had him sign the same, and forwarded it to the Industrial Accident Commission. The claim recited that plaintiff was injured away from the plant of his employer, by the negligence of the defendant.

Upon receipt of plaintiff's claim, the Commission made arrangements for hospital accommodations and the services of a nurse and physician for plaintiff, and on May 6th awarded plaintiff the sum of $37.44, the amount of compensation which he was entitled to under the Compensation Act as temporary total disability for the period of two weeks. A warrant was issued for that sum, and forwarded to plaintiff, who caused the same to be presented for payment upon May 10, 1921.

On May 25, 1921, the Commission made a further award of compensation to plaintiff in the sum of $43.68, also for temporary total disability, and which, with the previous award, equaled the amount plaintiff was entitled to, as such compensation, for the month of May 3 to June 3, 1921. A warrant was

issued for the last-mentioned sum, and forwarded to plaintiff.

On June 4, 1921, plaintiff, through Jay Bowerman, his attorney, returned the last-mentioned warrant to the Industrial Accident Commission, together with a cashier's check for $37.44, to cover the previous payment. In his letter of transmission, Mr. Bowerman informed the Commission that plaintiff desired to maintain a position where he could bring action against the defendant for damages resulting from his injury, and for that reason the money was returned.

In response to the letter of Mr. Bowerman, the Commission, on June 6, 1921, by letter acknowledged receipt of the returned warrant and the cashier's check covering the payment of $37.44 previously made to plaintiff, and stated that the Commission had expended on behalf of plaintiff, for nurse hire, $191. The letter also contained this further statement:

"We note your statement that it is Mr. Hick's desire to maintain a position where he can bring action against the Peninsula Lumber Company, and we therefore hand you herewith a formal Notice of Election blank, which we desire to have Mr. Hicks execute in order to complete our records in this case."

On June 21, 1921, plaintiff filled out and executed the form of Notice of Election above mentioned, and returned the same to the Industrial Accident Commission, together with his promissory note in favor of the Commission, payable on demand, for the sum of $191, to cover the nurse hire which the Commission had paid in connection with his injury. In the form executed by plaintiff, as aforesaid, he declared his election to seek his remedy against defendant.

The Commission received the declaration of plaintiff of his intention to seek his remedy against defendant, and made no further payment of compensation to plaintiff. And at no time has the Commission asserted or claimed any title to, or interest in, the right of action of plaintiff against the defendant.

Plaintiff alleged in his reply, and testified as a witness in his own behalf, that he did not know that he had any claim or right of action against the defendant at the time he filed his claim for compensation, nor at the time he received and accepted the payment of $37.44, and that he collected the warrant for the latter sum without any intention of making an election and without any knowledge that he had rights, concerning which he was required to make an election.

. The section of the Compensation Act upon which defendant relies, provides:

" * * that if the injury to a workman occurring away from the plant of his employer is due to the negligence or wrong of another not in the same employ, the injured workman * * shall elect whether to take under this act or seek a remedy against such other, such election to be in advance of any suit, and if he take under this act the cause of action against such other shall be assigned to the state for the benefit of the accident fund. If the other choice is made the accident fund shall contribute only the deficiency, if any, between the amount of recovery against such third person actually collected and the compensation provided or estimated by this act for such case. * * Any compromise by the workman of any suit which would leave a deficiency to be made good out of the accident fund may be made only with the written approval of the department." Section 6616, Or. L.

It will be noticed that in all cases where the injured employee pursues his remedy against a third person, the Commission must be consulted before a compromise can be made by the plaintiff for an amount less than the compensation provided by the statute, and also that such injured employee is entitled to compensation out of the accident fund for the deficiency, if any, between the amount of recovery actually collected and the compensation provided or estimated by the Compensation Act.

It follows from these provisions, that an injured workman, in order to preserve the rights afforded him by the act, is required to file a claim for compensation with the Commission, even though he intends to seek his remedy against the third party responsible for his injury. It is also clear that in many cases the injured employee cannot intelligently determine whether to accept the benefits of the act or seek his remedy against the third party, until the Commission has made a final award in his case, determining the amount of compensation the employee is entitled to receive from the Accident Fund. Consequently the mere filing of the claim, followed by an award of the full compensation provided by the statute, does not necessarily constitute an election nor effect an assignment of the employee's right of action against the third party. The only limitation as to time when the injured employee shall make the election required by the act is that such election shall be in advance of any suit. The statute contemplates that the workman shall weigh the advantages to himself of each of his alternative rights, and that, after consultation with the Commission, he shall make a deliberate choice of the remedy he deems of most value to himself. The decision of the

workman, if he elects to take under the act, must be followed by a formal assignment of his claim against the third party to the state for the benefit of the accident fund, and unless the workman is apprised of the fact that he possesses alternative rights and has knowledge of the nature and extent of those rights, he cannot make a real election.

Defendant contends that the award of two weeks' compensation to plaintiff by the Commission, and his receipt and acceptance of the sum so awarded, together with payment by the Commission of nurse hire for plaintiff, constituted an election by plaintiff to take under the act, and without further action by plaintiff, worked an assignment of his right of action against the defendant to the state for the benefit of the accident fund.

8. In conformity with the general rule applicable where a party is required to make an election between alternative remedial rights, the election which an injured workman is required to make under the provisions of Section 6616, Or. L., will not be presumed where the workman has acted in misapprehension of his legal rights and in ignorance of his obligation to make an election, especially when, as in the instant case, no other person's rights have been prejudicially affected thereby: *Rehfield* v. *Winters,* 62 Or. 299, 305 (125 Pac. 289); *Oregon Mill & Grain Co.* v. *Hyde,* 87 Or. 163, 174 (169 Pac. 791); *Iltz* v. *Krieger,* 104 Or. 59 (202 Pac. 409, 206 Pac. 550).

9. The payment of nurse hire by the Commission was made as first aid to the injured workman, and did not constitute any part of the compensation to which plaintiff was entitled under the act (§ 6628, Or. L.), and cannot be invoked to vest the state

with an interest in plaintiff's right of action against the defendant.

10. The sum of $37.44 paid to plaintiff on account of compensation under the act was promptly returned to the Commission and accepted by it, with the understanding between plaintiff and the Commission that any claim that the state had in plaintiff's right of action against the defendant by virtue of such payment was discharged and cut off by the refund of the amount of the payment.

The Commission is given full power and authority by the statute over that matter, as well as all other questions arising in the administration of the Compensation Act, and if plaintiff's rights were affected by the payment mentioned, the action of the Commission, amounting to a disclaimer of any interest in plaintiff's claim, under the circumstances, operated to restore plaintiff to the position he occupied before any payment was made, as completely as might have been done by a decree of a court of equity declaring that result.

11. The submission to the jury of the question of whether plaintiff had elected to take under the act was not error of which defendant is entitled to complain.

It follows that the judgment of the Circuit Court must be affirmed, and it is so ordered.

AFFIRMED.

McBRIDE, C. J., and BEAN and BROWN, JJ., concur.